UNITED STATES of America,
Plaintiff–Appellee,

v.

Emigdio ANGULO,
Defendant–Appellant.

No. 87–2949.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 8, 1988.
Decided Dec. 19, 1988.

Shelly B. Kulwin, Kulwin & Palmer, Chicago, Ill., for defendant-appellant.

Mark L. Potert, Asst. U.S. Atty. and Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, WOOD, Jr., and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

Emigdio Angulo appeals from his convictions for conspiring to distribute cocaine, 21 U.S.C. § 846, and for aiding and abetting another in the distribution of cocaine, 18 U.S.C. § 2, 21 U.S.C. § 841(a)(1). He contends (1) that the trial court erred in commenting during the defense's closing argument that a defense witness' stipulated testimony could not be presented to the jury as evidentiary fact; (2) that the evidence was insufficient to support his convictions; and (3) that the trial court abused its discretion in ordering him to reimburse the government for the costs of his court-appointed attorney. We reject Angulo's arguments and affirm his convictions.

I.

In early 1987, Drug Enforcement Administration (DEA) Special Agent Patricia Collins was investigating the drug-related activities of Elionel Sardinez (also known as "Cuevas" or "Moises Cuevas"). Using a confidential informant ("CI") named Tony

Centeno (also known as "Boriqua") as an intermediary, Collins twice purchased an ounce of cocaine from Sardinez. Between these purchases, Collins also began negotiations for the purchase of a kilogram of cocaine from Sardinez, who portrayed himself as a full-time drug dealer able to secure a kilogram per month for sale to Collins. During the second one-ounce purchase on March 23, 1987, Collins and Sardinez agreed on a $40,000 purchase price for the kilogram, but did not set the time and place for the transaction. The next day, Collins received a telephone call from Sardinez, whose common law wife, Evangelina Perez (also known as "Nancy"), acted as an English/Spanish interpreter. Collins and Sardinez agreed to consummate the sale of the kilogram in the Burger King parking lot across the street from Sardinez's and Perez's apartment building. On the morning of March 25, Sardinez telephoned Collins and told her that he would be ready with the cocaine at 1:30 that afternoon.

DEA Special Agent Robert Fanter was part of the surveillance team assigned to observe the Sardinez–Collins kilogram sale that afternoon. At about 12:30 p.m., Fanter, while parked across the street from Sardinez's apartment building, observed an AMC Eagle pull up and park near the building. Angulo and a woman named Nancy Hurtado got out of the Eagle and entered the building. Ten minutes later, Angulo returned to the vehicle, stuck a "football-sized package" wrapped in a brown Jewel Food Store shopping bag under his arm, and walked quickly back into Sardinez's apartment building.

According to Sardinez's trial testimony, he was in his and Perez's apartment the morning of March 25 with Perez, "Boriqua" (Centeno, the CI), and Judy Bonilla, the girlfriend of one of Perez's sons. Another of Perez's sons, Arturo Delphi, who lived in another apartment at the address, also was in the area. According to Sardinez, at around mid-day on March 25, a woman named Nancy Hurtado arrived at his apartment. Although Sardinez knew Hurtado, she never before had been to his apartment and he was not expecting her. Sardinez then left his third-floor apartment and went to the building's lobby, while Hurtado remained in the apartment with Perez and Bonilla. In the lobby, Sardinez encountered Angulo, who said he had the kilogram of cocaine for Sardinez in his car. Sardinez knew Angulo, though not from prior drug dealings and he did not know Angulo would be delivering the cocaine from his supplier, one Gustavo Mondalvo. After returning to his apartment and telephoning Collins, Sardinez went back to the lobby and told Angulo to get the cocaine from his car. Angulo then retrieved the cocaine, which was wrapped in a brown Jewel shopping bag, and positioned himself on some stairs within the building where Sardinez could not see him.

Sardinez then crossed the street, entered the car in which Collins and Centeno were waiting, and asked to see the $40,000, which Collins showed him. After agreeing with Sardinez to complete the transaction in the lobby of his apartment building, Collins parked her car in front of the building and entered the lobby. On their way into the building, Collins and Centeno saw Delphi, who spoke with Centeno. Once inside the lobby, Sardinez motioned for Collins to come up some stairs, where he gave her the package wrapped in the Jewel Food Store bag. After opening the package to make sure she was holding cocaine, Collins gave the arrest signal. Fanter and DEA Special Agent Greco responded and arrested Sardinez and Delphi in the lobby. They next entered the Sardinez/Perez apartment, where they found Perez, Bonilla, and Hurtado in the kitchen and Angulo on a porch off the dining room. Fanter arrested Angulo.

Perez testified that she was at her apartment with Bonilla and Hurtado on March 25, 1987. None of the three had discussed drug deals, and Perez did not know if Hurtado knew, as Perez did, that a drug deal was scheduled for that afternoon. According to Perez, Hurtado had entered her and Sardinez's apartment alone that morning, and the first time she saw Angulo that day was at 1:30 p.m. when he burst into the apartment shouting "police." The next time she saw Angulo was on June 4, 1987

when he came to her apartment and asked her to testify that, on March 25, he arrived at her apartment carrying a sweater in a plastic bag. She refused and he replied that "these dogs have done treason to me." Bonilla testified that she was in Perez's kitchen at 1:30 on March 25 as Perez was reading Hurtado's fortune, that she had been in the apartment all day, and that at 1:30 Angulo burst into the room shouting "Police."

Although Centeno was apparently available to testify as a witness at the trial, neither side summoned him. As the following passage reflects, however, both sides stipulated to their understanding of what Centeno would say if he were called to testify.

> DEFENSE COUNSEL: At this time, your Honor, I have a stipulation to read to the jury between the parties, if I may.
> THE COURT: Ladies and gentlemen, I'll remind you, there have been a few stipulations. I told you earlier in the trial and I'll tell you again, a stipulation is where both sides agree that something is a fact and so you may accept it as a fact.
> DEFENSE COUNSEL: Ladies and gentlemen, it is hereby agreed and stipulated between the parties that if Anthony Centeno were called to testify, he would state as follows: That he is a paid confidential informant who is employed by the Drug Enforcement Agency, that in March 1987, he was involved in an investigation of Elionel Sardinez, also known as Moises Cuevas, that on the morning of March 25, 1987, he was in the apartment of Elionel Sardinez and that Evangelina Perez, also known as Nancy, and Arturo Delphi were present, that at that time he witnessed an argument between these three individuals over who would deliver a kilo of cocaine to special Agent Collins, that on that same day, March 25th, 1987, at approximately 1:30 p.m., Centeno had a conversation with Arturo Delphi and that Delphi stated to him at that time— excuse me, asked him at that time if they had the money because the cocaine was upstairs in the apartment.
> THE COURT: All right, now, that was a stipulation that if that person was called, that's what that person would testify, is that correct?
> DEFENSE COUNSEL: That's correct, your Honor.
> THE COURT: All right.

Finally, Angulo testified that on March 25, 1987, he was in a grocery store on Chicago's West Side when he encountered Hurtado, an old friend, who asked him to give her a ride. Without asking where she was going, Angulo agreed. He then drove her to Sardinez's apartment several miles away in Chicago's uptown area, and went into the Sardinez's third-floor apartment with her. Although he had never been to Sardinez's apartment before, he knew Sardinez as "Moises." In the apartment were Sardinez, Delphi, Bonilla, and Perez. Angulo testified that Hurtado was carrying a large bag, and that he sat watching television as Hurtado and Perez talked in the kitchen. After about an hour, however, Angulo grew concerned about a sweater he left in his unlocked vehicle, so he returned to his car and retrieved the sweater, which was wrapped in a Jewel Food Store shopping bag. Angulo thought he might be able to sell it to someone in the apartment. Angulo stuck the sweater under his arm and was forced to run back into the apartment building by approaching traffic. When he returned to the apartment, only Hurtado and Perez were present. He placed the bag with the sweater in it on the floor and continued watching television. After a while, he walked onto the porch, where he was suddenly arrested.

According to Angulo, he went back to the apartment after his arrest in June on the advice of counsel to retrieve the sweater, but he did not bring along a corroborating witness. Angulo testified that Perez told him that her apartment had been burglarized and that she therefore could not tell whether any sweater was in the apartment on March 25. Perez purportedly blamed their problems on "Boriqua" and threatened to kill Centeno. Although Angulo at trial denied any knowledge of the drug transaction, the jury did not believe him and convicted him on both counts in the indictment. On November 17, 1987, the

district court sentenced Angulo to five years imprisonment for aiding-and-abetting and three years probation on the conspiracy-to-distribute-cocaine offense. The court also ordered Angulo to reimburse the government for the costs of his court-appointed attorney.

## II.

### A.

■ Angulo first claims that the district court committed reversible error when it commented during defense counsel's closing argument that the substance of Centeno's stipulated testimony could not be presented to the jury as evidentiary fact. During defense counsel's summation, the following exchange occurred:

DEFENSE COUNSEL: Fact: We know that Arturo Delphi, Mrs. Perez's son, was involved in the cocaine deal. He was there when the deal went down on the kilo, in the lobby. He asked Mr. Centeno—and the Government stipulated that this occurred—"Do you have the money? The cocaine is upstairs."

GOVERNMENT COUNSEL: Judge, I object to that. We stipulated that that statement was contained in the informant's report.

THE COURT: The stipulation was that if the informant was called to testify, he would testify in that vein. They didn't stipulate that what he said was true.

DEFENSE COUNSEL: That what their own confidential informant said was true?

THE COURT: Don't argue with me, sir. You know very well what I'm saying.

DEFENSE COUNSEL: I apologize, your Honor.

THE COURT: They stipulated that if he was called—and you agreed to the stipulation—that if he was called that is what would be said. They did not stipulate to the truth of it, so you cannot tell this jury in argument that that is a fact except by way of argument.

According to Angulo, the district court's remarks were legally inaccurate and so prejudicially undermined the evidentiary value of Centeno's stipulated testimony that he was denied a fair trial.

Angulo, however, never presented this argument to the district court. He raised no contemporaneous objection to the court's ruling, he sought no instruction by the court to the jury as to how the jury should consider the stipulated testimony, and he chose not to raise this claim in his otherwise thorough post-trial motion filed after the verdict but before the entry of Judgment of Conviction. Since " 'a litigant cannot present to this court as grounds for reversal an issue which was not presented to the trial court and which it, therefore, had no opportunity to decide,' " Angulo has waived this issue on appeal. *United States v. Carter*, 720 F.2d 941, 945 (7th Cir.1983) (quoting *Holleman v. Duckworth*, 700 F.2d 391, 394–95 (7th Cir.1983)).

Nor can we conclude that the district court committed plain error affecting Angulo's substantial rights. Angulo himself "concedes that the prosecution did not stipulate to the truth of what Centeno stated." The only error in the record, therefore, would seem to be defense counsel's, who mischaracterized the precise terms of the stipulation entered into by the parties. Angulo apparently feels that the district court's remarks effectively told the jurors that they could not accept Centeno's stipulated testimony as true. But this is belied by the passage above, in which the court ruled that defense counsel *could* argue that Centeno's stipulated testimony was true. In short, none of Angulo's arguments convinces us that the court's remarks concerning Centeno's stipulated testimony were improper.

### B.

■ Angulo next argues that the evidence was insufficient to support his conviction. According to Angulo, the prosecution's proof fell into two categories: the undisputed facts proving Angulo's presence at the scene of the crime and the testimony of three Perez "family" members—Sardinez, Perez, and Bonilla. Angulo basically argues that, since Sardinez and Perez testified pursuant to a negotiated

plea agreement, and because Sardinez was "a chronically mentally ill individual," their testimony must be completely disregarded. Because the remainder of the government's evidence proves only that Angulo was present at the scene, Angulo's argument goes, the evidence was insufficient to convict him.

We will reverse a conviction for lack of evidence "[o]nly when the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt." *United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987) (quoting *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985)). This standard requires that the defendant demonstrate that the government's theory was wholly unsupported by the evidence, and Angulo simply cannot do this. Angulo underestimates the testimony of DEA Agent Fanter, who observed Angulo park his car in front of Sardinez's apartment, enter the apartment building for ten minutes, and then return to his car to retrieve a package wrapped in a brown Jewel Food Store bag. According to Fanter, Angulo then returned quickly to the apartment building, where, within the hour, Sardinez provided Collins with a kilogram of cocaine wrapped in a brown Jewel Food Store bag. Angulo testified at trial that this package contained a sweater or sweaters for possible sale to inhabitants of the Perez apartment, but Judy Bonilla testified that Angulo was not carrying a package of any kind when he entered the Perez apartment on March 25. Instead, she testified, Angulo burst into the apartment shouting "police."

This alone is enough to support the government's theory that Angulo delivered a kilogram of cocaine to Sardinez on March 25 knowing that it was intended for distribution. Angulo exerts much effort attacking the credibility of Perez and Sardinez, but the same reasons he gives to impeach these witnesses' credibility on appeal were given to the jury, which is the appropriate entity for making credibility determinations. *See United States v. Peters*, 791 F.2d 1270, 1290 (7th Cir.1986). And while Angulo does a commendable job of attacking Sardinez's and Perez's testimony, we cannot help but point out that his own testimony is hardly unassailable. At least that was the jury's conclusion, and we will not overturn it.

### C.

■ Finally, Angulo contends that the district court improperly ordered him to reimburse the government for the costs of his court-appointed attorney as a condition of probation. After Angulo was arrested on March 25, 1987, he was provided with court-appointed counsel during his initial appearance and during his arraignment on a superseding indictment. On May 7, his private attorney filed a Motion for Substitution of Counsel on the ground that the Federal Defender Program operated under a conflict of interest in representing both Angulo and Delphi. The motion was granted, Angulo's current counsel was appointed, and Angulo submitted an undated affidavit requesting that the government pay the cost of defense counsel's services on the ground that he lacked the ability to pay.

Following Angulo's conviction, the district court held a sentencing hearing on November 13, 1987. During the course of that hearing the government pointed out that although Angulo had reported in his financial affidavit $600 in savings, he had earned $1,200 in interest income in 1986. The government also noted that although Angulo claimed that he was unable to pay for an attorney in May, 1987, he and his spouse somehow were able to place a $13,500 down payment toward the purchase of a two-flat apartment building the following month. Troubled by these questions concerning the legitimacy of Angulo's financial affidavit and dissatisfied with defense counsel's attempted explanations, the district court continued the sentencing hearing to allow defense counsel to investigate further.

At the reconvened sentencing hearing on November 17, 1987, the court still was skeptical

that [Angulo's] family can own two apartment buildings, making a $14,000 payment in June of this year [1987], shortly after all of this was supposed to have taken place. Surely, $5,000 evidently came out of [Angulo's wife's] passbooks, but that still makes a question mark about another $9,000. And on next to a poverty level income they have got two income-producing apartments and filed an affidavit saying that they were poor, and got government appointed counsel in the transaction.

With all, if there was $14,000 available for a down payment on an apartment in June of this year, it surely wasn't an accurate statement to the court relative to the financial circumstances of the defendant at the time.

Finding that Angulo was currently able to pay his attorney's costs, the court ordered him to reimburse the government for costs incurred as a condition of probation.

Angulo claims that the district court improperly concluded that he was able to pay his counsel's costs. He argues that the court should have inquired further into whether Angulo had attempted to retain private counsel, whether his wife would have given him all of her personal funds to hire private counsel, and so on. The issuance of an order directing the reimbursement of legal defense costs, however, "is a matter within the exclusive discretion of the trial court and is not such an event that requires the procedural safeguards of an adversary hearing." *United States v. Durka,* 490 F.2d 478, 480 (7th Cir.1973). And although 18 U.S.C. § 3006A(a) provides that the district court may appoint counsel at government expense for an indigent accused, 18 U.S.C. § 3006A(f) allows the court to direct the defendant to reimburse the treasury for such legal expenses if the court "finds that funds are available for payment from or on behalf of a person furnished representation." Here the court so found after inquiring further into Angulo's financial status. We therefore cannot conclude that the district court abused its discretion in requiring Angulo to reimburse the government for the costs of his court appointed counsel as a condition of probation.

AFFIRMED.