**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Thomas JOHNSTON, Defendant–Appellant.**

**No. 88–2375.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1989.

Decided June 7, 1989.

Richard F. Walsh, Chicago, Ill., for defendant-appellant.

David J. Stetler, Chief, Crim. Receiving and Appellate Div., John E. Farrell, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, POSNER and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Thomas ·Johnston, a police officer at the Glenview Naval Air Station in Glenview, Illinois, was convicted under the Assimilative Crimes Act of theft of a boat committed in a special territorial jurisdiction of the United States. *See* 18 U.S.C. § 13.[1] Mr.

---

**1.** Section 13 provides:
(a) Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of

Johnston was found guilty after a two-day bench trial. He was placed on thirty months' probation, was ordered to make restitution, to refrain from consuming alcohol, and to participate in an alcoholic treatment program. Mr. Johnston appeals his conviction. He asserts that the district court improperly denied his motion to suppress evidence, that there was insufficient evidence to support his conviction, and that restitution was ordered impermissibly. We affirm.

## I.

## Background

In September 1986, when he moved to an off-base apartment, Lieutenant Commander Alfred Ford left his power boat, a 1984 Baretta inboard/outboard fiberglass model approximately 17 feet in length, in the parking lot outside the bachelor officers' quarters at the Glenview Naval Air Station. On October 28, 1986, after being ticketed several times, the boat was towed to the base storage impound lot as abandoned property. Mr. Johnston, in his capacity as a base security officer, assisted in towing the boat to the impound lot.

While the boat was being stored in the impound lot, it generated interest among the security guards, including Mr. Johnston. Thomas Schier, one of Mr. Johnston's fellow security officers at the base, testified that the guards thought the boat was "nice" and would be worth purchasing if the owner "want[ed] to get rid of it." Tr. at 79. Another base security officer, George Woods, testified that Mr. Johnston had talked about the boat, saying that "we

would like to go fishing in it." Tr. at 126–27. Dennis Waltrip, a Watch Commander with the base Security Department during the time the boat was stored in the impound lot, testified that Mr. Johnston (along with other security officers) had asked him in early 1987 how Security Department personnel could obtain property that had been towed into the impound lot as abandoned. Petty Officer Waltrip explained to Mr. Johnston that cars were taken to an outside agency for crushing, but boats and trailers were taken to the Great Lakes Naval Station for public auction. See Tr. at 141–42. For several months while the boat was in the impound lot, Mr. Johnston himself served as an Assistant Watch Commander. In this supervisory position, he had special responsibilities with regard to the impound lot. Those duties included maintaining the impound log book and helping to tow vehicles into the lot.[2]

Mr. Johnston testified that he believed abandoned boats, as well as automobiles, were destroyed. On February 20, 1987, Mr. Johnston towed the boat out of the impound lot and took it to his home in Kenosha, Wisconsin. The Wisconsin Department of Natural Resources issued a boat registration to Mr. Johnston on February 23, 1987. On the registration form, he falsely stated that he had purchased the boat from a Mr. Jerry Pate. A security officer noticed the boat missing from the lot in late February, but failed to report it since he thought the owner had claimed the boat. In June 1987, Mr. Johnston took the boat to a fishing camp he had recently purchased in Vilas County, Wisconsin.

---

Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13(a).

The term "special territorial jurisdiction of the United States," as defined by section 7, includes "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, ... for the erection of a fort, magazine, arsenal, dockyard, or other needful building." 18 U.S.C. § 7(3).

Mr. Johnston was charged and convicted of theft as prohibited by Illinois law:

A person commits theft when he knowingly: (a) [o]btains or exerts unauthorized control over the property of the owner; ... and (1) [i]ntends to deprive the owner permanently of the use and benefit of the property....

Ill.Rev.Stat. ch. 38, para. 16–1(a)(d)(1).

2. Petty Officer Waltrip stated that Mr. Johnston "coordinated the impound book to reflect the vehicles we had inside that were placed there by private owners, so that we could have an orderly manner for the book in which to know what was in there." Tr. at 139.

Lieutenant Commander Ford discovered that his boat was missing from the impound lot in April 1987.[3] An investigation was then launched by the Naval Investigative Service. The investigator learned that Mr. Johnston had helped tow the boat into the impound lot, that he had registered a boat of the same make and size a few days after Lt. Commander Ford's boat was noticed missing, that the seller listed on the boat's registration application was fictitious, and that Mr. Johnston had purchased a fishing camp in northern Wisconsin. After obtaining this information, the naval investigator went to Wisconsin and asked Vilas County sheriff's detectives to visit Mr. Johnston's property to see if the boat was there. Two detectives drove to the property and, from the road, were able to see, on Mr. Johnston's property, a boat of the same size as the missing boat. The boat was in the front yard of Mr. Johnston's mobile home, near the driveway. The detectives then entered the property and lifted the boat's protective covering so that they could view the boat's registration numbers. The boat had on its hull the registration numbers issued to Mr. Johnston. The naval investigator then applied for a search warrant. The accompanying affidavit recited the boat's registration numbers. However, it also contained the information about Mr. Johnston's activities that had been previously discovered. On the basis of this affidavit, Circuit Judge James B. Mohr of the Circuit Court of Vilas County issued a search warrant authorizing the seizure of Lt. Commander Ford's boat. The naval investigator returned to the property with one of the detectives and seized the boat after comparing its motor number and drive shaft number with those listed in Lt. Commander Ford's records.

Mr. Johnston filed a motion to suppress any physical evidence seized during the execution of this search warrant. He argued that the detectives' entry of his property without a search warrant and without probable cause constituted an illegal search, and that the search warrant based upon this illegal search was defective. *See* R. 14. The district court denied Mr. Johnston's motion. The court held that, since the boat could be seen from the road, Mr. Johnston's expectation of privacy in the boat had been reduced "to virtually nil" and that the detectives were entitled to check the boat's registration number. *See* Tr. at 11–12.

## II.

### Analysis

#### A. *Legality of the search*

Mr. Johnston maintains that the evidence seized pursuant to the execution of the search warrant issued to the naval investigator should have been suppressed since the warrant was based on observations made during the course of an illegal search. He asserts that he had a reasonable expectation of privacy in a covered boat sitting on its trailer in the front yard of his mobile home. Nothing that identified the boat was exposed to the public. Thus, Mr. Johnston maintains that, in order for the police to enter his property without a search warrant, remove the protective tarp from the boat on its trailer, and search for the boat's registration numbers, they must have probable cause and be acting pursuant to a clear exception to the fourth amendment's search warrant requirement. Mr. Johnston maintains that, because the detectives in this case did not obtain the boat's identification numbers in a manner consistent with any exception to the search warrant requirement, the warrant issued to the investigator was defective. He contends that, without the observations made during the allegedly illegal search, the affidavit submitted did not establish sufficient probable cause for the issuance of a search warrant authorizing the seizure of the boat on his property. Thus, he submits that his

---

**3.** In November 1986, Lt. Commander Ford noticed that his boat was no longer in the parking lot where he had left it. He testified that, after learning that the boat had been towed to the impound lot, he arranged for its storage at that location. In early 1987, Lt. Commander Ford was deployed to Japan and Hawaii for several months, and, upon his return, he discovered that his boat was no longer in the impound lot.

motion to suppress should have been granted.

Mr. Johnston's argument that the detectives' observation of the boat's registration numbers constituted an illegal search raises a somewhat complex question regarding the search of an object arguably within the curtilage of the home. It is not necessary, however, for us to resolve this question. We believe that there was enough information in the affidavit to support the issuance of the search warrant even without the observations made by the detectives when they lifted the boat's protective covering.

In reviewing the validity of a search warrant supported by an affidavit containing information that is in part unlawfully obtained (as we assume, *arguendo,* here), we must consider whether " 'the untainted information, considered by itself, establishes probable cause for the warrant to issue.' " *United States v. Alexander,* 761 F.2d 1294, 1300 (9th Cir.1985) (quoting *James v. United States,* 418 F.2d 1150, 1151 (D.C.Cir.1969)); *see United States v. Korman,* 614 F.2d 541, 547 (6th Cir.) (after "disregarding any alleged information illegally obtained set forth in the affidavit for search warrant," court concluded "that the independent and legitimately obtained evidence established probable cause"), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980); *United States v. DiMuro,* 540 F.2d 503, 515 (1st Cir.1976) (" 'inclusion in an affidavit of indisputably tainted allegations does not necessarily render the resulting warrant invalid' "; warrant still valid when " 'the independent and lawful information stated in the affidavit suffices to show probable cause' ") (quoting *United States v. Giordano,* 416 U.S. 505, 555, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part)), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977); *see also Franks v. Delaware,* 438 U.S. 154, 156, 172, 98 S.Ct. 2674, 2676, 2684, 57 L.Ed.2d 667 (1978) (before voiding a search warrant when a defendant shows by preponderance of the evidence that a statement in search warrant affidavit was false or made with reckless disregard for the truth, court must "set to one side" the affidavit's false material and decide whether "the affidavit's remaining content is insufficient to establish probable cause"); *United States v. McHale,* 495 F.2d 15, 17 (7th Cir.1974) (per curiam) (A wiretap order is not invalid where "[t]here was sufficient information to find probable cause based on the untainted proper sources listed in the [wiretap] application.... This is the same principle which is applied in reviewing the issuance of search warrants where there is a question of whether there was sufficient probable cause to issue a warrant in which both tainted and untainted sources are set forth in the application."); *cf. Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) ("[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed.") (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

The information remaining in the affidavit after excluding the observations made by the detectives during their allegedly illegal search of the boat clearly provided the state court judge with the "substantial basis" necessary to conclude that probable cause existed to issue the search warrant. The affidavit included all of the investigative information linking Mr. Johnston to the boat—his role in towing the boat into the impound lot, his registration of a similar boat shortly after the boat was noticed missing, his use of a false seller's name on the boat's registration application, and his purchase of a fishing camp in Wisconsin. It also noted the detectives' observation of a boat on Mr. Johnston's Wisconsin property made from the public road. This information, standing alone, provided a firm basis for the state court judge's determination of probable cause: there was " 'a reasonable probability of finding the desired item[ ] in a particular location.' " *United States v. Pritchard,* 745 F.2d 1112, 1120 (7th Cir.1984) (quoting *United States v. Rambis,* 686 F.2d 620, 622 (7th Cir. 1982)). Because the naval investigator's affidavit, even without the allegedly illegally obtained information, was sufficient to

establish probable cause for the issuance of the search warrant, the district court did not err in denying Mr. Johnston's motion to suppress.

### B. *Sufficiency of the evidence*

■ Mr. Johnston also contends that his conviction for theft was not supported by sufficient evidence. Under the Illinois theft statute, the government is required to prove both that the allegedly stolen property was owned by another and that the defendant knew that the property was owned by another. Mr. Johnston maintains that he believed the boat was going to be destroyed as abandoned property and that this belief was reasonable in light of the facts and circumstances of this case. Thus, Mr. Johnston concludes that the government has failed to prove that he knew the boat was owned and not abandoned. We disagree.

An appellant raising a sufficiency of the evidence claim shoulders a heavy burden. In reviewing such a claim, we must consider the evidence in the light most favorable to the prosecution. "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of [the trier of fact] must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We only reverse a conviction for lack of evidence when the record contains no evidence, " 'regardless of how it is weighed,' " from which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *See United States v. Angulo,* 864 F.2d 504, 508 (7th Cir.1988) (quoting *United States v. Whaley,* 830 F.2d 1469, 1473 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988)); *United States v. Moya,* 721 F.2d 606, 610 (7th Cir.1983), *cert. denied,* 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984).

Mr. Johnston has failed to satisfy this rigorous standard. The government presented ample evidence supporting the district court's conclusion that Mr. John-

ston could not have believed that the boat was not owned by someone else and that he was entitled to treat it as abandoned property. *See* Tr. at 356–58. For example, the district court reasonably concluded that a person in Mr. Johnston's position, base police officer, could not have believed that he could drive off with a valuable boat without first going to his superiors in the Security Department for authorization. Indeed, the government presented testimony that Mr. Johnston was actually told that boats not retrieved from the impound lot were *not* destroyed, but were taken to the Great Lakes Naval Station for public auction. Tr. at 141–42. Moreover, a base security officer testified that vehicles towed into the impound lot were sometimes reclaimed by their owners and that, in order to obtain a vehicle in the lot, a security guard would have to attempt to find the owner and purchase it. *See* Tr. at 80–81. Another security officer testified that vehicles in the impound lot that were in good condition were not destroyed, and even those that were "junk" and were going to be destroyed could not just be taken by security guards. *See* Tr. at 129–30. In addition, Mr. Johnston's use of false information when registering the boat supports the inference that he knew his conduct was unauthorized. In light of this evidence, a rational trier of fact certainly could find that Mr. Johnston knew the boat was owned by someone else, not abandoned and free for the taking.

### C. *Restitution order*

Mr. Johnston's final contention on appeal challenges the district court's restitution order. Mr. Johnston maintains that the government's request for restitution is based on losses caused by deterioration of the boat occurring while the boat was left in the parking lot of the Vilas County Sheriff's Office after it had been seized. Mr. Johnston argues that he cannot be held liable for these losses since any damage to the boat after it had been seized was not proximately caused by his conduct.

■ The Assimilative Crimes Act, 18 U.S.C. § 13, under which Mr. Johnston was

convicted, allows a crime committed on government reservations to be punished "'only in the way and to the extent that it would have been punishable if the territory embraced by the reservation remained subject to the jurisdiction of the state.'" *United States v. Dunn,* 545 F.2d 1281, 1282 (10th Cir.1976) (quoting *United States v. Press Publishing Co.,* 219 U.S. 1, 10, 31 S.Ct. 212, 214, 55 L.Ed. 65 (1911)). Thus, under the Act, the district court is obliged to sentence the defendant under the applicable state law. *See United States v. Binder,* 769 F.2d 595, 600 (9th Cir.1985). Mr. Johnston correctly notes that, under Illinois law, a defendant convicted of theft can only be ordered to make restitution for losses "found to have been proximately caused by the conduct of the defendant or another for whom the defendant is legally accountable." Ill.Rev.Stat. ch. 38, para. 1005-5-6(a). There is no evidence in the record supporting his contention that the damage to the boat for which restitution was sought was caused by improper storage of the boat by law enforcement officers. By contrast, there was evidence presented at trial that the boat's propeller was damaged between the time it was stolen and subsequently recovered and that such propeller damage would reduce the value of the boat. *See* Tr. at 223, 234, 334, 347. Under these circumstances, the district court's restitution order was authorized by the Illinois sentencing statute.

## Conclusion

Mr. Johnston's conviction is affirmed. The district court did not err in refusing to grant Mr. Johnston's motion to suppress since the affidavit supporting the Wisconsin search warrant, even if the observations made during the allegedly illegal search are put to one side, contained information sufficient to support a finding of probable cause. In addition, sufficient evidence was presented by the government to allow a rational fact finder to find Mr. Johnston guilty of theft beyond a reasonable doubt. Finally, Mr. Johnston's challenge to the district court's restitution order must be rejected. Evidence of damage to the boat's propeller proximately caused by Mr. Johnston's conduct was presented at trial. Thus, the district court's restitution order was proper.

AFFIRMED.

POSNER, Circuit Judge, concurring.

I join the majority opinion, and write separately only to offer some thoughts about the proposition that a search warrant procured on the basis of an affidavit that contains unlawfully obtained information is nevertheless valid if the lawfully obtained information in the affidavit is sufficient by itself to establish probable cause for the search. The Supreme Court has not as yet so held, although the proposition was assumed in *Franks v. Delaware,* 438 U.S. 154, 156, 171–72 and n. 8, 98 S.Ct. 2674, 2676, 2684–85 and n. 8, 57 L.Ed.2d 667 (1978), and commanded the explicit support of four Justices in *United States v. Giordano,* 416 U.S. 505, 554–56, 94 S.Ct. 1820, 1845–46, 40 L.Ed.2d 341 (1974) (concurring and dissenting opinion). Loads of court of appeals cases so hold (including cases in this circuit)—for a *very* partial sample see *United States v. Vasey,* 834 F.2d 782, 788 (9th Cir.1987); *United States v. Eschweiler,* 745 F.2d 435, 439 (7th Cir.1984); *United States v. Williams,* 633 F.2d 742, 745 (8th Cir.1980); *United States v. Marchand,* 564 F.2d 983, 992–95 (2d Cir.1977) (Friendly, J.); *United States v. McHale,* 495 F.2d 15, 16–17 (7th Cir.1974) (per curiam); *James v. United States,* 418 F.2d 1150 (D.C.Cir.1969) —but few contain an extended discussion of the issue and those that do, notably *Marchand* and *James,* rely, questionably in my view, on the Supreme Court's decision in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *Wong Sun* holds that statements made by a criminal suspect in the wake of his unlawful arrest are not automatically inadmissible as "fruits of the poisonous tree"; if the statements have an independent, lawful source (whatever precisely this means), they are admissible. (See also *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), applying the "independent source" principle to physical evidence as distinct from statements.) The analogy to the search warrant based on

both legal and illegal evidence is patent, but like many analogies misleading. *Wong Sun* did not involve the subversion of the magistrate's role in the issuance of search warrants. The line of cases that culminates in our decision does. It gives law enforcement authorities an incentive to gather evidence by foul means as well as fair, and to serve up the entire gallimaufry to the magistrate in the hope that he will be persuaded and issue the warrant. For the search will be upheld against judicial challenge provided that the lawful evidence submitted to the magistrate, as appraised by a court after the completion of a successful search, established probable cause to conduct the search.

To take a concrete example—an exaggerated version of the present case—suppose the police have ample probable cause to obtain a warrant to search a suspect's house, but, to make assurance doubly sure, before applying for the warrant they break into the house and take pictures of contraband and then submit these to the magistrate along with their lawful evidence showing probable cause and tell the magistrate that the photographs had been handed them by the suspect's spouse. Such tactics would subvert the search-warrant process yet would be rewarded by a judicial determination that the search had been lawful because the lawful evidence submitted to the magistrate was sufficient—in the court's hindsightful view—to establish probable cause for the search. It is as if the search had been conducted without a warrant, and the court had had to decide (as it does for example when a search is made incident to an arrest and the issue is whether the arrest was made on probable cause), without any help from a magistrate's determination, whether there had been probable cause.

Although a powerful argument can thus be made that a search pursuant to a warrant procured on the basis of an affidavit that contains illegally obtained information should be invalidated regardless of whether there is other evidence to establish probable cause, the argument does not persuade me. Ordinarily when a decision is reversed because of tainted evidence, the remedy is further proceedings without the taint; yet even if it were possible to "remand" the determination of probable cause to the magistrate for a redetermination free of the tainted evidence, it would be entirely artificial to do so, the search having been long since conducted. Hence a rule that the presence of such evidence invalidates the warrant would be a heavy sanction indeed, undoing criminal prosecutions in many cases where the tainted evidence had done no harm because the warrant would have been issued anyway on the basis of legal evidence. The exclusionary rule is, many believe, already too heavy a sanction for illegal searches. This belief lies behind the "good faith," "inevitable discovery," "plain view," and "independent source" exceptions (see, e.g., *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Murray v. United States,* —— U.S. ——, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)) that singly and in combination are eroding the rule. Proposals that would make the exclusionary rule a heavier sanction by refusing to recognize a harmless-error doctrine in proceedings before magistrates must be viewed with extreme caution if we are to follow the route staked out by the Supreme Court.

Lurking in the background is the fact that while the Fourth Amendment places limitations on warrants, nothing in the text or background of the amendment requires law enforcement officers to obtain warrants in the first place in order to conduct searches. The Fourth Amendment forbids unreasonable searches *and* forbids general warrants; the prohibition of searches without warrants is a judicial gloss, by no means inevitable, on the amendment. See Taylor, Two Studies in Constitutional Interpretation 41 (1969). And despite all the sonorous talk about the advantages of having the inference of probable cause "drawn by a neutral and detached magistrate in-

stead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime," *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948), the ex parte character of a search-warrant proceeding makes the requirement of obtaining a warrant a formality in most cases. Perhaps the greatest practical value of the requirement is in forcing the compilation of a written record of the facts alleged to constitute probable cause *before* the search is conducted; and *that* requirement is satisfied whenever a warrant is actually obtained. The court in this case has only to determine whether the untainted materials that were before the magistrate would have persuaded the magistrate to issue the warrant. This court, rather than the police officer, is placed in the magistrate's shoes; this distinguishes the arrest case, where there has been no previous proceeding to determine probable cause. In the vast majority, perhaps all, of the cases in which this court concludes that probable cause existed on the basis of the (untainted) evidence presented to the magistrate, the magistrate would have issued the warrant, making the error in such cases *really* harmless.

So there will be some erosion of the warrant requirement as a result of the course followed in this case, just as there has been some erosion of the right to jury trial as a result of the principle of harmless error. (And see *United States v. Eschweiler, supra,* 745 F.2d at 439, where we analyzed the issue whether the search was invalidated by the tainted evidence presented to the magistrate in explicit harmless-error terms.) But in both cases the erosion is slight and in both there are offsetting considerations which seem to me, as they have seemed to most other judges in recent years, weightier.