UNITED STATES of America

v.

Mohammed RASHED.

No. Crim. 87–308 RCL.

United States District Court, District of Columbia.

Dec. 21, 1999.

Ronald Walutes, Assistant United States Attorney, Scott Glick, U.S. Department of Justice, Susan Sinclair, U.S. Department of Justice, Washington, DC, for United States.

Robert L. Tucker, Tony Miles, Gregory Poe, Assistant Federal Public Defenders, Washington, DC, for Defendant.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

Defendant Mohammed Rashed moves this Court for dismissal of Counts 1 and 3–7 of the indictment in this case, claiming that his prior prosecution in Greece for offenses resulting from the same aircraft bombing forecloses a United States trial on these charges. Specifically, defendant argues that the Double Jeopardy Clause of the Fifth Amendment bars a U.S. prosecution because the United States so dominated and controlled the Greek proceedings that the dual sovereignty doctrine does not apply. Alternatively, he asserts that the Montreal Convention[1] prohibits "serial prosecutions" for the conduct it proscribes. This Court finds defendant's arguments unpersuasive. Thus, having considered the memoranda of law in support of and in opposition to this motion, oral argument, and the relevant law, defendant's motion to dismiss is DENIED. Moreover, as the Court finds that to valid legal basis exists to support defendant's double jeopardy claim, defendant's accompanying motion to compel discovery is likewise DENIED.[2]

---

1. Convention on Suppression of Unlawful Acts Against the Safety of Civil Aviation, 24 U.S.T. 564, T.I.A.S. No. 7570, Signed on September 23, 1971 in Montreal Canada.

2. Defendant seeks discovery of information relating to his "sham prosecution" claim. Because the documents he seeks are classified, he must demonstrate that the requested documents are "helpful to the defense." *United States v. Yunis*, 867 F.2d 617, 623–24 (D.C.Cir.1989). Having found that defendant's double jeopardy claim fails as a matter of law, it follows, *a fortiori*, that there can be no documents "material" to this invalid defense. *United States v. Rezaq*, 899 F.Supp. 697, 704 (D.D.C.1995). Moreover, the United States has searched for documents in its possession that were generated between defendant's arrest in May 30, 1988 and the Greek decision not to extradite Rashed on September 11, 1990 and has located and turned over the one document they have found, which is marginally responsive at best.

## I. Background

### A. The U.S. Indictment

Defendant Mohammed Rashed, who is believed to have been the second-in-command of the "15th of May" Palestinian terrorist organization, has been charged with conspiring to attack the interests of the United States through a series of bombing missions at various locations around the world. In particular, Rashed is charged with placing a bomb on board an August 11, 1982 Pan Am flight from Tokyo, Japan to Honolulu, Hawaii. The bomb exploded 20 minutes before the flight was scheduled to land in Hawaii, killing a Japanese teenager, Toru Owaza, and wounding 15 other passengers. In addition, during the same month, another bomb was discovered on a Pan Am aircraft in Rio de Janeiro, Brazil, but was removed safely.

On July 14, 1987, a federal grand jury in Washington, D.C. returned a nine-count, sealed indictment against defendant Rashed and two co-conspirators, his Austrian-born wife Christine Pinter and Abu Ibrahim, the alleged bomb maker. As noted above, the charges at issue in the present motion are Counts 1 and 3–7; they are as follows: Count 1 charges defendant Rashed and the two co-conspirators with conspiring to commit murder by means of planting an explosive on a U.S. air carrier in violation of 18 U.S.C. § 1117. Count 3 charges the defendants with the premeditated murder of Toru Ozawa, by means of an explosive device within the special territorial jurisdiction of the United States. 18 U.S.C. § 1111. Count 4 charges the defendant with damaging a civilian aircraft in violation of 18 U.S.C. § 32. Count 5 charges defendant with damaging property by means of an explosive in violation of 18 U.S.C. § 844(I). Count 6 charges defendant with placing a bomb on an aircraft intended for foreign air transportation in

violation of former 49 U.S.C.App. § 1472(1)(2) (1986). Count 7 charges defendant with assaulting aircraft passengers in violation of 18 U.S.C. § 113(a).

### B. The United States Requests Extradition

Defendant Rashed was apprehended by Greek authorities on May 30, 1988, when he attempted to use a false Syrian passport to leave Athens, Greece. Upon learning of Rashed's intention and pursuant to the bilateral extradition treaty [3] in effect at that time, the United States requested that Greece provisionally arrest Rashed pending transmission of a formal extradition request. Greece provisionally arrested the defendant, but did not give the United States the two months allowed under the extradition treaty to perfect the extradition request. Rather, Greece insisted that the United States provide the extradition documents on an expedited basis. *See* Transcript of Hearing in Chambers, June 1, 1988, at 2. Accordingly, the United States submitted these documents to Greece in early June 1988. The extradition documents indicated that the United States sought the defendant's extradition for a U.S. prosecution on all counts contained in the indictment. Notably, nothing in the request suggested that the United States wanted Greece to prosecute Rashed. *See* In the Matter of the Extradition of Mohammed Rashed a/k/a Rashed Mohammed.

Subsequently, the U.S. extradition request was channeled through the Greek judicial system. In connection with this process, Greece requested and was supplied with additional information from the United States. In November 1988, the Greek Supreme Court determined that Rashed could not be extradited on the conspiracy counts of the indictment, but that he would be extradited on the rest of

---

**3.** Treaty of Extradition between the United States and the Hellenic Republic, signed May 6, 1931 [47 Stat. 2185; TS 855; 8 Bevans 353; 138 LNTS 293], as further interpreted by the Protocol signed September 2, 1937 [51 Stat. 357; EAS 114; 8 Bevans 366; 185 LNTS 408].

the charges relating to the bombing of the Pan Am flight from Tokyo to Hawaii. Before the Greek Supreme Court would finalize this decision, however, the United States had to provide Greece with additional evidence. The United States turned over this evidence, and the Greek Court entered an extradition order for Rashed on four of the nine counts.[4] Decision 820/1989, Greek Supreme Court, Sixth Penal Section, dated May 13, 1989.

In light of the extradition order and the expectation that Rashed would be transferred to the United States, U.S. prosecutors began interviewing witnesses and preparing for trial. Meanwhile, after inconclusive Greek elections that left no single party capable of commanding a majority, the Greek government refused to transfer custody of the defendant. Thus, more than 27 months after the United States had originally requested Rashed's extradition, and over a year after his extradition had been authorized by Greek's highest court, Greek political authorities denied the U.S. extradition request. Moreover, Greece informed the United States that it had decided to exercise its right as a signatory to the Montreal Convention and prosecute Rashed itself. As the Greek Minister of Justice explained to the United States, "under present conditions, the extradition of the Palestinian citizen is not expedient." Decision, the Minister of Justice, Non–Extradition of the Palestinian Citizen Mohammed Rashed to the USA Authorities, September 11, 1990.

## C. The Greek Indictment and Prosecution

The day after Greece informed the United States that it would not be honoring its extradition request, the Athens Public Prosecutor issued the Greek equivalent of an indictment, charging Rashed with four violations of Greek law: "[i]ntentional homicide be a perpetrator dangerous to the public safety," Greek Article 26, ¶ 1(a); "illegal seizure of aircraft," Greek Article 178, ¶ 1; "[p]lacement of explosive devices in aircraft," Greek Art. 180; and "[i]nstigation of damage to aircraft," Greek Art. 179, ¶ 1. See Hellenic Republic Public Prosecutor's Office District Court A.B.M. B90/2695.[5] Greek officials subsequently appointed a magistrate, Aspassia Karellou, to proceed with an investigation into these charges. This investigation included requests for assistance from the United States, as well as an evidence-gathering visit to the United States. Over the course of this investigation, Karellou and the Greek prosecutors were shown all of the original evidence collected by the United States, as well as evidence obtained from other foreign countries. And, once Rashed's trial was underway, Greek prosecutors formally subpoenaed several FBI Special Agents to testify and U.S. prosecutors traveled to Greece to handle additional requests for assistance from Greek prosecutors.

Following his trial before a three-judge court, defendant Rashed was convicted of the intentional homicide and the explosives charges. He was acquitted of the aircraft seizure and damage charges. He was subsequently sentenced to 18 years in prison. Decision 16/1992, Minutes and Decision, Athens Court of Appeals, January 8, 1992. Nevertheless, under Greek law, defendant Rashed was entitled to a new trial de novo by a five-member appellate court. As such, just as they had during the first trial, Greek prosecutors requested U.S. assistance and subpoenaed FBI special agents as witnesses. The second court of appeals also convicted defendant Rashed of the

---

4. The extradition order did not cover Counts 8 and 9 of the indictment because, unbeknownst to the United States, a Greek prosecutor unilaterally decided not to request extradition on these two counts. Accordingly, the order denied extradition on these counts.

5. The Greek indictment was translated by a Senior Legal Specialist at the Library of Congress. Memorandum from The Library of Congress to the U.S. Dep't of Justice, November 4, 1998.

first and third counts of the Greek indictment, but his sentence was reduced to 15 years. Decision 664/1993, Minutes and Decision, Athens Court of Appeals, July 5, 1993. The Greek Supreme Court affirmed the sentence and conviction. Decision 362/1995, Greek Supreme Court, January 31, 1995.

After having been in custody for eight years, Rashed was released from prison by Greek authorities in early December 1996. In his travels away from Greece, Rashed was taken into custody. He was subsequently arrested by the FBI and taken into United States custody, where he remains to date.

## II. Double Jeopardy

 The Double Jeopardy Clause of the Fifth Amendment provides that "[n]o person ... shall be subject for the same offense to be twice put in jeopardy of life and limb...." U.S. CONST. AMEND. V. Thus, the Clause may be invoked to bar a second prosecution by the same sovereign following an acquittal or a conviction. *Heath v. Alabama,* 474 U.S. 82, 93, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); *Abbate v. United States,* 359 U.S. 187, 194, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). This protection, however, does not extend to sequential prosecutions by separate sovereigns for the same offense. *Heath,* 474 U.S. at 92, 106 S.Ct. 433; *United States v. Wheeler,* 435 U.S. 313, 317, 98 S.Ct. 1079, 55 L.Ed.2d 303; *United States v. Rezaq,* 134 F.3d 1121, 1128 (D.C.Cir.1998). Rather, "when a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he was committed two distinct 'offenses'" for purposes of double jeopardy. *Heath,* 474 U.S. at 88, 106 S.Ct. 433 (citing *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922)).

### A. The Dual Sovereignty Doctrine

The dual sovereignty doctrine emerged from "the common law conception of crime as an offense against the sovereignty of the government." *Heath,* 474 U.S. at 88, 106 S.Ct. 433. As such, when an individual by a single act violates the laws of two sovereigns, he has "committed two offenses, for each of which he is justly punishable." *Id.* To a large extent, the doctrine developed to accommodate the demands of concurrent state-federal jurisdiction in our unique system of federalism. *Id.* at 92, 106 S.Ct. 433 ("It is axiomatic that 'in America, the powers of sovereignty are divided between the government of the Union, and those of the States.'") (citing *McCulloch v. Maryland,* 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579 (1819)); *see also Lanza,* 260 U.S. at 381–82, 43 S.Ct. 141 (holding that state court prosecution did not bar subsequent federal charges under National Prohibition Act). Essentially, it was feared that "[p]rosecution by one sovereign for a relatively minor offense might bar prosecution by the other for a much graver one, thus effectively depriving the latter of the right to enforce its own laws." *Wheeler,* 435 U.S. at 316, 98 S.Ct. 1079. Today, as the scope of criminal enterprises becomes increasingly global, this rationale has renewed force. *See, e.g. Richardson,* 580 F.2d at 947 (noting glaring disparity in penalties for drug offenses between the United States and Guatemala).

 Evaluation of double jeopardy claims in the context of separate sovereigns "turns on whether the two entities draw their authority from distinct sources of power." *Heath,* 474 U.S. at 88, 106 S.Ct. 433. That is, courts assessing the merits of double jeopardy claims must examine "the ultimate source of the power under which the respective prosecutions [are] undertaken." *Wheeler,* 435 U.S. at 318, 98 S.Ct. 1079 (stating that Navajo tribe acts as an independent sovereign in criminally punishing a tribal offender). Where the power to prosecute derives from distinct sources, the dual sovereignty doctrine permits each sovereign to vindicate its interests and enforce its own laws. *Id.* at 320, 98 S.Ct. 1079 (citing *United*

States v. Lanza, 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922)). Accordingly, under the dual sovereignty doctrine, sequential state and federal prosecutions for the same offense are not barred by double jeopardy. Heath, 474 U.S. at 88, 106 S.Ct. 433 (stating that "the Court has uniformly hold that the States are separate sovereigns with respect to the Federal Government because each State's power to prosecute is derived from its own 'inherent sovereignty,' not from the Federal government"). Similarly, the Supreme Court has found that a federal prosecution of a Navajo tribe member was not barred by a previous tribal prosecution. United States v. Wheeler, 435 U.S. 313, 318, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). While the Supreme Court has yet to address squarely whether the dual sovereignty doctrine also applies to sequential foreign and federal prosecutions, those courts of appeals addressing the issue have determined that the doctrine applies. United States v. Guzman, 85 F.3d 823, 826 (1st Cir.1996) (trial in Netherlands Antilles did not bar U.S. prosecution); United States v. Baptista–Rodriguez, 17 F.3d 1354, 1362 (11th Cir.1994) (Bahamian prosecution did not bar U.S. action); Chua Han Mow v. United States, 730 F.2d 1308, 1313 (9th Cir.1984) (holding that Malaysian conviction was no bar to federal prosecution); United States v. McRary, 616 F.2d 181, 184 (5th Cir.1980) (holding that Cuban prosecution did not bar subsequent U.S. prosecution); United States v. Richardson, 580 F.2d 946, 947 (9th Cir.1978) (Guatemalan proceedings no bar to U.S. charges); United States v. Martin, 574 F.2d 1359, 1360 (5th Cir.1978) (stating that "[t]he Constitution of the United States has not adopted the doctrine of international double jeopardy" and holding that U.S. prosecution not barred by Bahamian trial).

## B. The "Sham Prosecution" Exception

Wisely, defendant Rashed does not challenge what is uncontrovertible—that the United States and Greece are separate sovereigns. Cf. United States v. Rezaq, 134 F.3d 1121, 1128 (D.C.Cir.1998) (holding that prior trial in Malta did not bar sequential United States prosecution); see also Richardson 580 F.2d at 947 (holding that prior Guatemalan prosecution did not bar U.S. action and stating that "prosecution by a foreign sovereign does not preclude the United States from bringing criminal charges"). Rather, acknowledging that he is unable to take advantage of the Clause's standard protection, defendant endeavors to fit his case into a narrow exception to the dual sovereignty doctrine—the so-called "sham prosecution" exception. Bartkus v. Illinois, 359 U.S. 121, 122, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). In Bartkus, the Supreme Court affirmed a defendant's subsequent state conviction on robbery charges following his acquittal on the same charges in a federal prosecution. Noting that the prosecutions were separately conducted and that federal authorities had simply cooperated with state prosecutors, the Supreme Court determined that the record in Bartkus contained a support for defendant's claim that the state was acting "merely as a tool of the federal authorities" or that the state prosecution was "a sham and a cover for a federal prosecution." Id. at 124, 79 S.Ct. 676.

Courts addressing these sham prosecution claims have consistently noted that the exception is extremely narrow and thus, it imposes a substantial burden on defendants. See, e.g., Guzman 85 F.3d at 826 (noting that "under very limited circumstances, successive prosecutions by separate sovereigns might transgress the Double Jeopardy Clause"); United States v. Aboumoussallem, 726 F.2d 906, 910 (2d Cir.1984) (describing exception as narrow); United States v. Gonzalez, 907 F.Supp. 785, 789 (D.Del.1995) (noting that the facts of Bartkus "serve to illustrate the narrow exception"). Indeed, some courts have questioned whether such an exception exists at all. See, e.g., Baptista–Rodriguez, 17 F.3d at 1360 (questioning whether ex-

ception is valid); *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir.1993) ("We have questioned whether *Bartkus* truly meant to create such an exception, and we have uniformly rejected such claims."); *United States v. Raymer*, 941 F.2d 1031, 1037 (10th Cir.1991) (stating that "a possible exception might exist"); *United States v. Harrison*, 918 F.2d 469, 474 (5th Cir.1990) (noting that in *Bartkus*, the Supreme Court "did not define a clear exception in that case"); *United States v. Johnson*, 973 F.Supp. 1102, 1104 (D.Neb. 1997) (stating that Supreme Court alluded to potential exception in *Bartkus* ). Significantly, none of the courts of appeals addressing sham prosecution claims in the context of successive foreign and federal prosecutions has ever found the sham prosecution exception to be applicable. *Guzman*, 85 F.3d at 826; *Baptista–Rodriguez*, 17 F.3d at 1360; *Chua Han Mow*, 730 F.2d at 1313; *McRary*, 616 F.2d at 184; *Richardson*, 580 F.2d at 947; *Martin*, 574 F.2d at 1360.

While the D.C. Circuit has not specifically addressed the validity of the "sham prosecution" exception in the context of sequential foreign and federal prosecutions, it has addressed the exception in the federal-state context. In *United States v. Liddy*, the D.C. Circuit interpreted *Bartkus* to "stand[ ] for the proposition that federal authorities are proscribed from manipulating state processes to accomplish that which they cannot constitutionally do themselves." *United States v. Liddy*, 542 F.2d 76, 79 (1979). The court of appeals stated that "the burden of establishing that federal officials are controlling or manipulating state processes is substantial." *Id.* Accordingly, to satisfy this substantial burden, defendant must show that the state officials had "little or no independent volition in the state proceedings." *Id.*

■ Thus, assuming that the sham prosecution exception is available in the international context, and that this same standard applies, defendant Rashed must demonstrate that the Greek officials had "little or no independent volition" in the Greek proceedings and that the United States used the Greek prosecution to achieve what they could not otherwise achieve under the Constitution. *Liddy*, 542 F.2d at 79. Such a showing necessarily eludes the defendant in this case. Simply put, Greece's decision to prosecute was *directly contrary* to the United States' expressed wishes. As such, it cannot be argued that Greece lacked independent volition, when it *refused* to do what the United States wanted it to do—extradite Rashed. Instead, Greece exercised its independent, sovereign prerogative and chose to prosecute Rashed under its own laws. *A fortiori*, then, the United States cannot be said to have "manipulated" Greece into prosecuting Rashed, when a Greek prosecution was the exact opposite result from what the United States wanted to achieve.

Similarly, defendant's sham prosecution claim must also fail because defendant is unable to point to anything whatsoever that the U.S. prosecutors were able to achieve through a Greek prosecution of Rashed that they could not have constitutionally achieved in a prosecution in a United States court. *Liddy*, 542 F.2d at 79. Defendant does not point to any inadmissible evidence that was used in the Greek proceeding. Nor, as was charged in *Liddy*, were federal authorities trying to circumvent defendant's speedy trial rights of the Sixth Amendment. *Id.* Quite the contrary, the United States gained absolutely nothing from the Greek prosecution, except for substantial delay of its own opportunity to vindicate its own laws.

■ Nor does the fact that the United States cooperated and assisted with the Greek prosecution counsel in favor of a finding that the sham prosecution exception applies in this case. Despite the fact that Rashed was never extradited pursuant to the Montreal Convention, the Convention still imposed certain obligations upon the United States and other signatory nations. Specifically, Article 11(1) pro-

vides, in relevant part, that "[c]ontracting states shall afford one another the *greatest measure of assistance* in connection with criminal proceedings brought in respect of the offences." Montreal Convention, Art. 11(*l* ) (emphasis added). Thus, as a signatory to the Convention, the United States was *required* to cooperate with the Greek authorities in their prosecution of Rashed. Nothing in defendant's allegations leads this Court to find that the United States' actions constituted conduct in excess of its duty to provide "the greatest measure of assistance" to the Greek authorities. Moreover, allegations of cooperation between separate sovereigns do not amount to a facially valid double jeopardy claim. *See United States v. All Assets Of G.P.S. Automotive Corp.*, 66 F.3d 483, 494 (2d Cir.1995) (stating that "we have repeatedly held that even significant cooperation ... does not provide a basis for applying the *Bartkus* exception"); *Baptista–Rodriguez,* 17 F.3d at 1362 (stating that self-serving conclusions regarding cooperation between sovereigns insufficient to establish prima facie case under narrow exception); *United States v. Figueroa–Soto,* 938 F.2d 1015, 1020 (9th Cir.1991) ("None of this close collaboration amounts to one government being the other's 'tool' or providing a 'sham' or 'cover.' "); *Richardson,* 580 F.2d at 947 (noting that cooperation between U.S. and Guatemalan officials is standard practice); *Gonzalez,* 907 F.Supp. at 790 (rejecting sham prosecution claim, finding that "defendant alleges nothing more than cooperation between state and federal officials").

### C. Blockburger's "Same Elements" Test

■ Having found that defendant's sham prosecution fails as a matter of law, this Court need not reach the merits of his double jeopardy claim. *Rezaq,* 134 F.3d at 1128 (holding that double jeopardy claim was barred for two reasons: separate sovereigns and different offenses); *Liddy,* 542 F.2d at 79 (denying double jeopardy claim under sham prosecution exception without

analyzing identity of elements); *see also Richardson,* 580 F.2d at 947 (same). Nevertheless, assuming *arguendo* that the assistance and cooperation of the United States in the Greek proceedings was enough to satisfy the extremely narrow *Bartkus* exception, defendant Rashed's claim would still face an insurmountable hurdle. Specifically, double jeopardy only bars retrial when the offenses charged are the "same offence." U.S. CONST. AMEND. V. To determine whether double jeopardy bars a subsequent prosecution, courts must inquire "whether each offense contains an element not contained in the other." *United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993); *Blockburger v. United States,* 284 U.S. 299, 303, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.").

■ Applying the "same elements" test to the present case, it becomes patent that defendant's assertions lack merit. First, with respect to Count 1, which alleges a conspiracy, there is no analogue to this offense that was prosecuted in Greece. Defendant concedes this point, but urges that in the international context, a conduct-based test should apply because similar offenses may be defined differently in various countries, But this approach has been explicitly rejected by the Supreme Court. *See Dixon,* 509 U.S. at 704, 113 S.Ct. 2849 (overruling *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990)). Accordingly, as the charges in Count 1 have yet to be tried, double jeopardy does not apply.

A careful comparison of the rest of the United States charges with those tried in Greece also demonstrates that defendant's challenge must fail. Count 3 in the U.S. indictment alleges premeditated murder in

the special maritime and territorial jurisdiction of the United States (here, an aircraft owned by a U.S. corporation). 18 U.S.C. § 1111. The corresponding Greek charge, "intentional homicide by a perpetrator dangerous to the public safety," does not contain the premeditation element, nor, more critically, does it contain the jurisdictional element.[6] Likewise, Count 4, which alleges willful damage to a civil aircraft operated in foreign air commerce, 18 U.S.C. § 32, contains both a mens rea and jurisdictional element not found in its Greek counterpart, which charges "instigation of damage to aircraft." Similarly, Count 5, which alleges the use of an explosive to destroy an aircraft in foreign air commerce that resulted in the death of a passenger, 18 U.S.C. § 844(I) also contains a jurisdictional element, as well as the requirement that death resulted. Greek charge 3 simply charges defendant with "placement of an explosive device in an aircraft" contains neither of these elements. Count 6 of the United States indictment charges defendant Rashed with placing a bomb on an aircraft "in and intended for foreign air transporta-

tion" "with reckless disregard for the safety of human life." But here again, Greek charge 3 contains neither the mens rea requirement nor the jurisdictional element. Finally, with respect to U.S. Count 7, there is no Greek counterpart for the charge that defendant Rashed assaulted the crew and passengers of the Pan Am flight. Accordingly, applying *Blockburger* to the instant charges, the offenses charged in the U.S. indictment are not the "same" as those tried in Greece. Thus, there is no double jeopardy bar to trying defendant Rashed on these offenses in the United States.

## III. The Montreal Convention

█ Perhaps anticipating the likely demise of his sham prosecution claim, defendant alternatively argues that the Montreal Convention bars "serial" prosecutions. Specifically, defendant asserts that the "extradite or prosecute" provision of the Montreal Convention evidences an intent to preclude successive prosecutions. Montreal Convention, Article 5(2). This argument is misguided.[7] In short, wheth-

6. Defendant urges this Court to disregard the jurisdictional elements of the offenses charged in the U.S. indictment. Essentially, he argues that, for *Blockburger* purposes, jurisdictional elements will always differ in cases brought by separate sovereigns. *See, e.g., United States v. Gibson*, 820 F.2d 692, 698 (5th Cir.1987) (holding that conviction for robbery of government property within special territorial jurisdiction of United States was comparable to a lesser included offense of robbery of mail or U.S. property). But *Gibson* is inapposite. That case involved the question of whether prosecution under two different *federal* statutes with similar jurisdictional reaches would violate the Double Jeopardy Clause. Disregarding the jurisdictional elements in that case did not divest the United States of jurisdiction to prosecute the substantive offenses. Here, by contrast, overlooking the jurisdictional requirement would thwart Congress's express intent to create jurisdiction to combat crimes of this type. *See, e.g., United States v. Hairston*, 64 F.3d 491, 495 (9th Cir.1995) (noting that a jurisdictional element of a statute reflects Congress's intent to combat certain evils).

7. Even if this argument were not misplaced, it would still be fatally flawed. First, the D.C. Circuit has explicitly rejected this same argument once before. *Rezaq*, 134 F.3d at 1129 (construing an identical provision in the Hague Convention and stating that "the context [of the provision] makes clear that the statute's injunction to extradite or prosecute is not meant to state mutually exclusive alternatives."). Nevertheless, defendant seizes upon language in the court of appeals' prior opinion that alluded to an argument with "more persuasive force." Specifically, defendant points out that Article 5(2) refers to "alleged offender," rather than "offender." Defendant maintains that the inclusion of the word "alleged" in this paragraph evidences an intent to foreclose serial prosecutions. In short, defendant reasons that someone who has been already been prosecuted is no longer an "alleged offender," so the drafters of the Montreal Convention must have intended to bar sequential prosecutions. *See* Montreal Convention, Article 5(3).

While such an argument may well have more persuasive force than the argument that extradition and prosecution are not mutually

er the Montreal Convention bars serial prosecutions is irrelevant to this matter, as defendant Rashed was neither extradited nor taken into custody pursuant to the Convention or any other extradition treaty. As the Supreme Court has explained, "treaty limitations apply only in the case of [a] person who has been brought within the jurisdiction of the court by virtue of proceedings under an extradition treaty." *United States v. Alvarez–Machain*, 504 U.S. 655, 659, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) (quoting *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886)). Here, Rashed was taken into custody by U.S. authorities through means other than the Montreal Convention or any other treaty. Consequently, any supposed limitation in the Montreal Convention would not extend any benefit or protection to defendant Rashed.

exclusive, it still misses the mark. Had the drafters of the Montreal Convention intended to bar successive prosecutions, it is unlikely that they would have done so in such an imprecise and oblique manner. This already flawed argument is fatally undercut by the clear language appearing in the very next paragraph of the same article, which states that "[t]his Convention does not exclude any criminal jurisdiction exercised in accordance with national law." Art. 5(3). As these plain terms demonstrate, the Convention was not intended to preempt signatory nations from exercising their own criminal jurisdiction. Rather, had the Montreal Convention intended to bar successive prosecutions by different sovereigns, this paragraph would make little sense.