UNITED STATES of America,
Appellee,

v.

Mohammed RASHED, a/k/a Rashid
Mohammed, Appellant.

No. 00–3006.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 13, 2000.

Decided Dec. 19, 2000.

Robert L. Tucker, Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs was A. J. Kramer, Federal Public Defender.

John F. De Pue, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Scott J. Glick and Susan A. Sinclair, Attorneys, and Wilma A. Lewis, U.S. Attorney.

Before: WILLIAMS, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Mohamed Rashed moved the district court to dismiss six of the nine counts of an indictment charging him with terrorism. He claimed that under the Double

Jeopardy Clause his prior prosecution in Greece for related offenses foreclosed a prosecution in the United States. Rashed recognized that the dual sovereignty doctrine normally renders the double jeopardy bar inapplicable in cases of prosecutions by different sovereigns. But he invoked an exception overriding the dual sovereignty doctrine when one sovereign's prosecution is a "sham" for prosecution by the other. See *Bartkus v. Illinois,* 359 U.S. 121, 123–24, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). The district court denied the motion. *United States v. Rashed,* 83 F.Supp.2d 96 (D.D.C.1999).

We affirm. In no reasonable sense of the word was Greece's prosecution of Rashed a sham. Far from being controlled by the United States, the Greek trial occurred only because Greece rejected U.S. demands for Rashed's extradition, yet was subject to the requirement of Article 7 of the Montreal Convention to prosecute Rashed itself if it failed to extradite him. Convention on Suppression of Unlawful Acts Against the Safety of Civil Aviation, Sept. 23, 1971, arts. 7–8, 24 U.S.T. 565, 571 ("Montreal Convention").

* * *

Rashed is charged with participating in various bombing enterprises around the world in violation of U.S. law. The charges include placing a bomb on an August 11, 1982, Pan Am flight from Tokyo to Honolulu, killing one and wounding 15 passengers. Rashed is also charged with conspiring in the same month to place a bomb on a Pan Am aircraft in Rio de Janeiro, a bomb that luckily was discovered and removed safely. The counts of the indictment at issue here, 1 and 3–7, all relate to the bomb on the Tokyo–Honolulu flight.

At the request of the United States, Greek authorities detained an individual bearing a passport in the name of Mohammed Hamdan on May 30, 1988. The individual was in fact Rashed, who here asserts—at the expense of his notion that Greece is a U.S. pawn—that the United States did not tell Greece of Hamdan's true identity for fear that otherwise Greece wouldn't have apprehended him. After verifying Rashed's capture, the United States requested his extradition under its bilateral extradition treaty with Greece. Treaty of Extradition between the United States and the Hellenic Republic, May 6, 1931, 47 Stat. 2185, as further interpreted by the Protocol, Sept. 2, 1937, 51 Stat. 357. In May 1989 the Greek Supreme Court ruled that Rashed could be extradited on some but not all counts of the U.S. indictment. Decision 820/1989, Greek Supreme Court, Sixth Penal Section (May 12, 1989). But the Greek government delayed handing Rashed over to the United States and officially rejected the United States's extradition request in September 1990. Instead Greece chose to pursue Article 7's alternative course, that of prosecuting Rashed itself. Montreal Convention, art. 7, 24 U.S.T. at 571.

A Greek court found Rashed guilty of intentional homicide and placement of explosive devices in an aircraft, but acquitted him of charges of illegal seizure of an aircraft and instigation of damage to aircraft. Although sentenced to 15 years in prison, he was released on December 5, 1996, after serving eight and a half years. In the course of his travels away from Greece he was taken into custody and arrested by the FBI.

In denying Rashed's motion to dismiss, the district court not only rejected Rashed's sham prosecution theory but also concluded that none of the charges satisfied the *Blockburger* test for determining when crimes stated in two charges constitute "the same offense." *Rashed,* 83 F.Supp.2d at 103–04; see *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). We affirm, but because we reject the sham prosecution theory we have no need to address the *Blockburger* issue.

* * *

The Double Jeopardy Clause of the Fifth Amendment provides that "[n]o per-

son shall be subject for the same offense to be twice put in jeopardy of life and limb." The clause forecloses multiple prosecutions for the same offense by the same sovereign, but not ones by different sovereigns. *Heath v. Alabama,* 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (successive state-state prosecutions); *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (successive Navajo tribal court-federal prosecutions); *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (successive state-federal prosecutions); *United States v. Rezaq,* 134 F.3d 1121 (D.C.Cir.1998) (successive foreign-federal prosecutions). The exception for dual sovereignty flows from the understanding that every sovereign has the authority to punish infractions of its own laws. *Wheeler,* 435 U.S. at 317, 98 S.Ct. 1079.

In *Bartkus v. People of State of Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), however, the Supreme Court implicitly suggested an exception to the dual sovereignty doctrine. Illinois had brought a robbery charge against a man who had been acquitted of the same charge in federal court. The Court upheld the state prosecution, but emphasized that the evidence failed to show that Illinois, in bringing its suit, had been "merely a tool of the federal authorities" or that its prosecution had been "a sham and a cover for a federal prosecution." *Id.* at 123–24, 79 S.Ct. 676. A number of circuits have accordingly inferred a "sham prosecution" exception to dual sovereignty. See, for example, *United States v. Raymer,* 941 F.2d 1031, 1037 (10th Cir.1991); *United States v. Bernhardt,* 831 F.2d 181, 182 (9th Cir.1987). *United States v. Balsys,* 524 U.S. 666, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998), may indicate further support for such an exception. There the Court held that while fear of prosecution in a foreign country normally does not provide a basis for asserting the Fifth Amendment right against self-incrimination in a judicial proceeding in the United States, a different result might be appropriate if the foreign nation brought its prosecution "as much on behalf of the United States as of the prosecuting nation" itself. *Id.* at 698–99, 118 S.Ct. 2218.

Several courts have stressed that the *Bartkus* exception is a narrow one and difficult to prove. *United States v. Guzman,* 85 F.3d 823, 827 (1st Cir.1996) (narrow exception); *United States v. Aboumoussallem,* 726 F.2d 906, 910 (2d Cir.1984) (same); *United States v. Figueroa–Soto,* 938 F.2d 1015, 1019 (9th Cir.1991) (difficult to prove). Others have questioned whether the exception even exists. *United States v. Brocksmith,* 991 F.2d 1363, 1366 (7th Cir.1993); *United States v. Patterson,* 809 F.2d 244, 247 n. 2 (5th Cir.1987). We have uncovered no case where a court found successive prosecutions by different nations to fall under the *Bartkus* exception, though defendants have tried the theory in at least four cases. See *Guzman,* 85 F.3d at 827; *United States v. Baptista–Rodriguez,* 17 F.3d 1354, 1361 (11th Cir. 1994); *United States v. McRary,* 616 F.2d 181, 185 (5th Cir.1980); *United States v. Richardson,* 580 F.2d 946, 947 (9th Cir. 1978). The government suggests that we should hold the exception inapplicable to foreign prosecutions. It reasons foreign governments are never subject to the sort of federal domination that states may be, so that the sham relationship is much less probable in the international context. Improbability may imply rarity, but we do not think the sham relationship so unlikely as to justify a blanket rule against the exception in the foreign prosecution context.

As a preliminary matter, we are not persuaded by Rashed's suggestion that the United States may have been in "privity" with Greece in that government's prosecution, and that this privity argues for finding the sham exception applicable. (Rashed makes no collateral estoppel claim per se, identifying no issue that was resolved in his favor in the Greek litigation.) In general, a party is in privity with anoth-

er if it "assume[d] control over litigation" by the other. *Montana v. United States,* 440 U.S. 147, 154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). See also 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4451, at 428 (1981). Wright, Miller & Cooper suggest that control is enough if "the nonparty has the actual measure of control or opportunity to control that might reasonably be expected between two formal coparties." *Id.* at 430, citing *Jones v. Craig,* 212 F.2d 187 (6th Cir.1954). Courts have occasionally hinted that privity as ordinarily conceived might justify application of collateral estoppel in the dual sovereignty context, but, finding privity requirements unmet, have not reached the issue. See *United States v. Davis,* 906 F.2d 829, 834–35 (2d Cir.1990); *United States v. Parcel Land at 5 Bell Rock Road,* 896 F.2d 605, 610 (1st Cir.1990) (Breyer, J.). Because double jeopardy is a constitutionalized instance of preclusion principles, *Ashe v. Swenson,* 397 U.S. 436, 445–46, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), a privity or control test represents an obvious candidate as the standard for an exception to the dual sovereignty doctrine.

Yet in *Bartkus* the Court used the terms "sham" and "tool," which indicate—and have uniformly been understood by the lower federal courts to indicate—a far more special relationship than is suggested by the concept of privity or control, namely a relationship with a strong element of manipulation. See *United States v. Liddy,* 542 F.2d 76, 79 (D.C.Cir.1976) (reading *Bartkus* as support for the proposition that "federal authorities are proscribed from manipulating state processes to accomplish that which they cannot constitutionally do themselves"); *Guzman,* 85 F.3d at 827 (emphasizing that the *Bartkus* exception is limited to situations in which one sovereign "thoroughly dominates or manipulates the prosecutorial machinery of another"). An easy case, for example, might be where a nation pursued a prosecution that did little or nothing to advance its independent interests, under threat of withdrawal of American aid on which its leadership was heavily dependent. But where the United States simply lends a foreign government investigatory resources, the manipulation moniker is out of the question. *Id.* at 828; *Baptista–Rodriguez,* 17 F.3d at 1361.

The Court's presumably deliberate nonuse of the privity concept may also have reflected a recognition that under the dual sovereignty doctrine one sovereign's right to enforce its criminal law cannot be classified as the same "cause of action" as another's, and that the double jeopardy bar is more akin to claim preclusion than to issue preclusion. Cf. *Montana v. United States,* 440 U.S. at 154, 99 S.Ct. 970 (stating that res judicata applies only to the same cause of action, and a cause of action vicariously asserted by a nonparty "differs by definition from that which he subsequently seeks to litigate in his own right"); but see *Richards v. Jefferson County,* 517 U.S. 793, 797–802, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) (noting that res judicata may bar claims by privies, but finding application of res judicata a violation of due process on the specific facts before it). In any event, the *Bartkus* Court's selection of one formula precludes our adoption of another. And here we needn't consider the issue-preclusive effects of foreign judgments.

■ The central issue in this case is whether Greece, in prosecuting Rashed, was a tool of the United States and the Greek trial a sham. Two facts render Rashed's claim implausible. First, the United States wanted Greece to extradite Rashed, not to prosecute him. Greece stood its ground and refused. Rashed acknowledges both the U.S. preference and the Greek resistance. He points to what we may loosely call evidence that the United States threatened Greece with sanctions, but that evidence itself shows that the threats (if made at all) were always intended to secure extradition. See, for example, *U.S. Blackmails Greece on Rash-*

*id [sic] Matter Through Aid,* Eleftherotypia, May 27, 1989; *New Pressure by the U.S. for Rashid [sic],* Eleftherotypia, Sept. 30, 1989; *Statement on the Rashid [sic] Case by Efstratios Korakas, Member of Greek Parliament representing the Communist Party of Greece and Member of European Parliament as of June 1999.* The stalwart Greek resistance dispels any notion that Greece had "little or no independent volition" in its proceeding. *Liddy,* 542 F.2d at 79 (D.C.Cir.1976); *United States v. 38 Whalers Cove Drive,* 954 F.2d 29, 38 (2d Cir.1992).

Rashed argues that the United States preferred a Greek prosecution to Rashed's release. But that the United States got its second preference over its third is not evidence either of control or of a sham prosecution, especially where the United States's first option would have avoided the double jeopardy problem altogether. Moreover, the only evidence Rashed has for the proposition that the United States sought a Greek prosecution on terrorism charges is unsubstantiated Greek newspaper stories claiming that "[r]umors have it that the Americans don't necessarily want Rashid [sic] right now, provided he stays in prison and is not let free." *U.S.: Cut Off Relations with the Arabs!,* Pondiki, Feb. 17, 1989. See also *The Blade—The Americans Find New "Evidence",* Pondiki, Feb. 24, 1989. Had Rashed read the two stories in their entirety he would have learned that the United States did not want Rashed imprisoned on the terrorism charges. Rather, the scuttlebutt offered in the articles is that the United States wanted a prison guard to plant a knife on Rashed while he was awaiting extradition and have the Greek courts imprison him for the separate crime of possession of an illegal weapon.

Second, Greece had an undeniable duty under the Montreal Convention to extradite Rashed. Montreal Convention, art. 8, 24 U.S.T. at 571. Once it rebuffed the United States's extradition request, however, it was bound by the same treaty to

prosecute. *Id.,* art. 7, 24 U.S.T. at 571. Rashed's response is that the United States tricked Greece into arresting him; thus, but for the trick, Greece would never have faced the dilemma of having to extradite or prosecute. But even after the arrest, Greece could have chosen extradition; yet it refused to extradite, contrary to the United States' wishes and in the face of alleged congressional hints of foreign aid sanctions.

Rashed offers other items as clues that Greece was a tool of the United States. First, he points to extensive cooperation between the United States and Greece in his first trial. Indeed, U.S. assistance was so pervasive that Greece gathered little of the presented evidence independently. But *Bartkus* acknowledges that extensive law enforcement and prosecutorial cooperation between two sovereigns does not make a trial by either a sham. *Bartkus,* 359 U.S. at 122–23, 79 S.Ct. 676. Indeed, courts have rejected the sham inference in the face of more far-reaching cooperation than that which occurred between Greece and the United States. See, for example, *United States v. Padilla,* 589 F.2d 481, 484 (10th Cir.1978) (rejecting a double jeopardy claim based on successive state-federal prosecutions although state prosecutor was also the federal prosecutor and the only piece of evidence in the case was the testimony of a state police officer). An inference of sham prosecution from cooperation would be especially weak where the Montreal Convention applies, for on these facts it required the United States to afford Greece the maximum possible assistance. Montreal Convention, art. 11(1), 24 U.S.T. at 572. Finally, it would little advance the purposes of the Double Jeopardy Clause to require that the country more bent on prosecution refuse to cooperate with the other, forcing the latter to waste its resources in a redundant investigation.

Rashed also argues that Greece had no independent interest in prosecuting him. It is true that none of the offenses for which Rashed was prosecuted in Greece had any

specific link to Greece, such as it being the site of the offense or the residence of the victims. But international law recognizes stopping terrorism and piracy on (or above) the high seas as an interest of all nations, an interest strong enough to give the Greek courts jurisdiction. Restatement (Third) of the Foreign Relations Law of the United States, §§ 404, esp. comment a, and 423 (1987). Further, Greece had an interest in abiding by its treaty obligations—here the requirement of the Montreal Convention, in the event of a refusal of extradition, to prosecute Rashed "without exception whatsoever and whether or not the offense was committed in its territory." Montreal Convention, art. 7, 24 U.S.T. at 571.

The government suggests—and Rashed accepts—that one possible sign that the United States was using the Greek prosecution as its "tool" would be an indication that it was able, through the Greek prosecution, to achieve something it could not under the U.S. Constitution. Cf. *United States v. Liddy*, 542 F.2d at 79. Of course a procedural divergence alone would necessarily give only a weak sign; states and nations naturally vary in details of criminal procedure, so a rule inferring manipulative intent merely from a few prosecutorial advantages in the state or nation that initially prosecutes would gut the dual sovereignty rule. Similarly, the fact that dual prosecution is likely to increase the probability of conviction and the probable aggregate prison sentence is alone of no consequence, as dual prosecution always has those effects. But a prosecutorial advantage, coupled with some evidence that the United States had helped bring it about, or that its existence had induced the United States to prefer and promote the foreign prosecution, might help support the "tool" inference.

All Rashed has to offer on this account is a law, passed by Greece just before his trial, that had the effect of allowing him to be tried to a panel of three judges rather than a mixed jury of three judges and four lay jurors. Greek Law 1897/1990, art. 12, ¶ 1 (Aug. 11, 1990). Rashed does not claim that the United States pressured Greece into adopting the law, or that the United States saw Rashed's right to a jury trial as a hurdle to prosecution at home. Further, the bedrock fact that the United States sought extradition over a Greek prosecution is completely inconsistent with an intent to bypass the U.S. Constitution.

Ultimately we find that Rashed has failed to identify evidence that would place his case within the *Bartkus* "sham prosecution" exception. It is possible that, because terrorist acts committed anywhere are criminal in all countries, Rashed might find himself confronted with a Sisyphean challenge: defeating the claims against him in one country only to have them brought against him in another. As this is only his second prosecution, the hazard is speculative. We leave the solution to another day.

■ As a corollary to his double jeopardy claim, Rashed seeks discovery of information related to his "sham prosecution" allegation. We see no reason to disturb the district court's denial of his request. Because Rashed's defense here relates not to refutation of the government's case in chief but to establishment of an independent constitutional bar to the prosecution, Rule 16(a)(1)(C) of the Fed.R.Crim.P. is inapplicable. *United States v. Armstrong*, 517 U.S. 456, 462–63, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). *Armstrong* requires the defendant, as a condition of discovery, to adduce "some evidence tending to show the essential elements of" the defense, not just evidence "material" to that defense as required by Rule 16. *Id.* at 462, 470, 116 S.Ct. 1480. In *Armstrong*, which involved a claim of selective prosecution, the Court explained that this "rigorous standard" was suitable to prevent undue diversion of prosecutorial resources and disclosure of the government's prosecution strategy. *Id.* at 468, 116 S.Ct. 1480. Discovery into Rashed's claim of "sham" prosecution presents the same issues of prosecutorial

**1286**

resources and strategy, together with sensitive matters of foreign relations. Cf. *United States v. Yunis*, 867 F.2d 617, 622–23 (D.C.Cir.1989).

In any case, Rashed has not met either the *Armstrong* or the Rule 16(a)(1)(C) test. He doesn't claim that the United States preferred prosecution to extradition, or that further discovery would uncover evidence of such a preference. He certainly cannot deny that the Montreal Convention required prosecution once Greece refused extradition to the United States. The most that Rashed suggests would be uncovered in discovery is evidence that the United States, upon learning that Greece would refuse extradition, encouraged that government to prosecute rather than release Rashed. But such evidence, as we have explained, would not sustain a conclusion that Greece was a tool of the United States.

The district court's decision to deny Rashed's motion to dismiss on grounds of double jeopardy is

*Affirmed.*